No. 23-13958-P
IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
DEATH PENALTY CASE

———————————————

JEFFERY DAY RIEBER,

Petitioner-Appellant,

v.

JOHN HAMM,
COMMISSIONER OF THE ALABAMA DEPARTMENT OF CORRECTIONS,
Respondent-Appellee.

———————————————

Appeal From The United States District Court For
The Northern District of Alabama
Case No. 5:18-cv-00337-ACA
Honorable Judge Annemarie Carney Axon

———————————————

REPLY BRIEF OF PETITIONER-APPELLANT

———————————————

James A. Friedman
GODFREY & KAHN, S.C.
One East Main Street
Ste. 500
Madison, WI 53703
Phone: (608) 257-3911
Email: jfriedman@gklaw.com

Emma J. Jewell
GODFREY & KAHN, S.C.
833 East Michigan Street
Ste. 1800
Milwaukee, WI 53202
Phone: (414) 287-9616
Email: ejewell@gklaw.com

July 1, 2024                    *Attorneys for Jeffery Day Rieber*

*Rieber v. Hamm*
No. 23-13958

## **CERTIFICATE OF INTERESTED PERSONS**

Undersigned counsel certifies the following persons may have an interest in the outcome of this case:

Axon, Honorable Annemarie Carney – United States District Judge Northern District of Alabama;

Bensky, Lawrence – former counsel for Jeffery Day Rieber, Petitioner-Appellant, in the state post-conviction proceedings and habeas corpus petition to the Northern District of Alabama; retired;

Blankenship, Honorable Jeri, Madison County Circuit Court Judge; deceased;

Chadbourne, James, former Madison County Assistant District Attorney;

Craig, Glenda – victim;

Dunn, Jefferson S. – former Commissioner of the Alabama Department of Corrections, Respondent;

Equal Justice Initiative;

Evans, James – former Alabama Attorney General;

Friedman, James A. – counsel for Jeffery Day Rieber, Petitioner-

Appellant; attorney at Godfrey & Kahn, S.C.;

Gabrielson, Kerry L. – former attorney at Godfrey & Kahn, S.C. and

counsel for Jeffery Day Rieber, Petitioner-Appellant, in the state

post-conviction proceedings and habeas corpus petition to the

Northern District of Alabama;

Galbraith, Tina A. – former counsel for Jeffery Day Rieber, Petitioner-

Appellant, in the post-conviction proceedings; former attorney at

King & Spalding in Atlanta Georgia;

Godfrey & Kahn, S.C., counsel for Jeffery Day Rieber, Petitioner-

Appellant;

Hall, Honorable Karen K. – Madison County Circuit Court Judge;

Hamilton, Honorable Laura Jo – retired Madison County Circuit Court

Judge;

Hamm, John Q. – Commissioner of the Alabama Department of

Corrections, Respondent;

Hayden, Jon B. – former Assistant Attorney General;

Hill, Anne Adams – former Assistant Attorney General;

Houts, James R. – former Assistant Attorney General;

Hughes, Beth Jackson – Assistant Deputy Attorney General;

Jewell, J. Emma – counsel for Jeffery Day Rieber, Petitioner-Appellant;
attorney at Godfrey & Kahn, S.C.;

Kempaner, Richard A. – trial counsel and counsel on the direct appeal
for Jeffery Day Rieber, Petitioner-Appellant;

King, Troy – former Assistant Attorney General;

King & Spalding, former counsel for Jeffery Day Rieber, Petitioner-
Appellant;

Law Office of Lawrence Bensky, LLC, former counsel for Jeffery Day
Rieber, Petitioner-Appellant;

Marshall, Steve – Attorney General;

Moran, Dan – trial counsel for Jeffery Day Rieber, Petitioner-Appellant,
and counsel on the direct appeal;

Morgan, Timothy W. – former District Attorney of Madison County;

Narvey, Daniel C.W.  – former attorney at Godfrey & Kahn, S.C.,
former counsel for Jeffery Day Rieber, Petitioner-Appellant;

Poe, Beth Slate – former Assistant Deputy Attorney General;

Pryor, William – former Assistant Attorney General and former

> Attorney General;

Raybon, Terry – Warden of Holman Correctional Facility;

Sess, Elizabeth – Assistant Attorney General;

Sessions, Jeff – former Alabama Attorney General;

Simpson, Lauren A. – Assistant Attorney General;

Stafford Rosenbaum LLP, former counsel for Jeffery Day Rieber,

> Petitioner-Appellant;

Stephens, Michelle Riley – former Assistant Attorney General;

Stevenson, Bryan A – counsel for Jeffery Day Rieber, Petitioner-

> Appellant on direct Appeal to the Alabama Court of Criminal

> Appeals and Alabama Supreme Court;

Thomas, Kim T. – former Commissioner of the Alabama Department of

> Corrections;

Tuerkheimer, Frank M. – former counsel for Jeffery Day Rieber,

> Petitioner-Appellant, in the state post-conviction proceedings and

> the habeas corpus petition to the Northern District of Alabama;

> deceased;

Wiesner, Ellen L., A – counsel for Jeffery Day Rieber, Petitioner-

    Appellant on direct Appeal to the Alabama Court of Criminal

    Appeals and Alabama Supreme Court.

**\* \* \***

    No publicly traded company or corporation has an interest in the

outcome of this case or appeal.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................ii

ARGUMENT ...............................................................................1

I.    TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
PURSUE A DEFENSE BASED ON VOLUNTARY
INTOXICATION. ...............................................................1

    A.    Mr. Kempaner Failed To Conduct A Minimally Effective
Investigation Into The Obvious Defense Of Voluntary
Intoxication.................................................................1

    B.    Mr. Kempaner's Failure To Pursue A Voluntary Intoxication
Defense Was Not Reasonable. ...................................4

    C.    Mr. Kempaner's Failures Prejudiced Mr. Rieber. .................6

II.    SENTENCING COUNSEL WAS INEFFECTIVE FOR
FAILING TO DEVELOP AND PRESENT MITIGATING
EVIDENCE OF MR. RIEBER'S INTOXICATION AT THE TIME
OF THE CRIME. ...............................................................11

    A.    The Presentation Of Mitigating Evidence Related To
Mr. Rieber's Good Character Does Not Excuse The Failure
To Develop Mitigating Evidence Of Mr. Rieber's Drug Use.12

    B.    Mr. Moran's Failure To Develop Mitigating Evidence Related
To Mr. Rieber's Drug Use Was Prejudicial. ..........................16

III.    LAW AND JUSTICE SUPPORT GRANTING MR. RIEBER'S
HABEAS PETITION. ........................................................19

CONCLUSION ...........................................................................22

CERTIFICATE OF COMPLIANCE ......................................................23

CERTIFICATE OF SERVICE...............................................................24

i

# TABLE OF AUTHORITIES

## CASES

*Atkins v. Virginia,*
536 U.S. 304 (2002) ............................................................... 20

*Dill v. Allen,*
488 F.3d 1344 (11th Cir. 2007) .............................................. 4

*Ex parte Bankhead,*
585 So. 2d 112 (Ala. 1991) ..................................................... 6

*Ex parte Harrell,*
470 So. 2d 1309 (Ala. 1985) ................................................. 20

*Fletcher v. State,*
621 So. 2d 1010 (Ala. Crim. App. 1993) ...................... 7, 8, 11

*Hardwick v. Sec'y, Fla. Dep't of Corr.,*
803 F.3d 541 (11th Cir. 2015) ................................................ 3

*House v. Balkcom,*
725 F.2d 608 (11th Cir. 1984) ............................................... 3

*Hurst v. Florida,*
577 U.S. 92 (2016) ................................................................ 19

*Kennedy v. Louisiana,*
554 U.S. 407 (2008) .............................................................. 21

*McKinney v. Arizona,*
589 U.S. 139 (2020) .............................................................. 21

*Owen v. State,*
611 So. 2d 1126 (Ala. Crim. App. 1992) ............................... 7

*People v. Rodriguez,*
564 N.E.2d 658 (N.Y. 1990) .................................................. 7

*Silvey v. State,*
485 So. 2d 790 (Ala. Crim. App. 1986) ................................. 7

*Strickland v. Washington,*
 466 U.S. 668 (1984) ................................................................ 4

*Wiggins v. Smith,*
 539 U.S. 510 (2003) ............................................................... 3

## STATUTES

Alabama Code § 13A-5-46 ......................................................... 20

Alabama Code § 13A-5-51(2) ..................................................... 15

Alabama Code § 13A-5-51(6) ..................................................... 15

## RULES

11th Cir. R. 22-2 ....................................................................... 23

Fed. R. App. P. 32(a)(5) ............................................................ 23

Fed. R. App. P. 32(a)(6) ............................................................ 23

Fed. R. App. P. 32(a)(7)(B) ...................................................... 23

Fed. R. App. P. 32(f) ................................................................. 23

## OTHER AUTHORITIES

Ala. Senate Bill 16 (Ala. Act 2017-131) .................................. 20

# ARGUMENT

## I.  TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PURSUE A DEFENSE BASED ON VOLUNTARY INTOXICATION.

### A.  Mr. Kempaner Failed To Conduct A Minimally Effective Investigation Into The Obvious Defense Of Voluntary Intoxication.

Mr. Kempaner knew that an alibi defense had little chance of success. (Resp. Br. at 13.) Confronted with video evidence and testimony that the individual depicted in the video footage resembled Mr. Rieber, Mr. Kempaner described the strength of the prosecution's case as one of the strongest he had ever seen (Doc. 16-83 at 47)[1], said he was "confident" Mr. Rieber would be convicted (Doc. 16-83 at 9-10), and told Mr. Rieber's mother that if Mr. Rieber did not accept a plea agreement, Mr. Kempaner would see her at her son's funeral. (Doc. 16-83 at 11.) The clothes, cash, and weapon found in Mr. Rieber's possession within hours after the crime all pointed to Mr. Rieber. (Doc. 16-75 at 12-17, 74-76.) And the proffered alibi defense – that Mr. Rieber was at work until late in the afternoon and could not have committed

---

[1] The page numbers in the record on appeal and the reporter transcripts refer to the district court document number and the page numbers refer to the page numbers that appear on the header generated by the electronic filing system.  The Brief of Respondent-Appellee, (Doc. 24), cites to the page number assigned prior to the record being filed with the district court.

the crime – was completely undercut by his employer's time record showing that Mr. Rieber checked out of work in the early afternoon. (Doc. 16-77 at 45-47.) This document was in the prosecution's file and accessible to Mr. Kempaner. (Doc. 16-85 at 30-31.) Despite these facts, the state argues that pursuing a mistaken identity defense was "a reasonable strategy under the circumstances of this case." (Resp. Br. at 14.)

Mr. Kempaner's decision to proceed on the doomed alibi defense was not reasonable. But more importantly, Mr. Kempaner was aware of the viable alternative defense of voluntary intoxication, yet he chose to do *nothing* to investigate this defense. Dr. Rogers' report indicated that Mr. Rieber said he had *no recollection* of the events of the evening because of heavy drug consumption in the period before the crime. (Doc. 16-83 at 13; Doc. 16-86 at 130-132.) Mr. Kempaner read Dr. Rogers' report, including her conclusions, and chose not to follow up with Mr. Rieber about the facts he reported to Dr. Rogers. (Doc. 16-83 at 13-14, 38-39.) Mr. Rieber's petition, therefore, is not based on counsel's "unsuccessful trial tactics" or strategic choices (Resp. Br. at 23); rather, it is based on counsel's complete failure to conduct any inquiry into an

obvious and viable defense that would have foreclosed the possibility of a death sentence.

The failure to conduct a minimally effective investigation into known alternative defenses is ineffective assistance of counsel. *Wiggins v. Smith,* 539 U.S. 510, 511 (2003). Under *Wiggins*, a court shows deference to defense counsel's judgment as to which defenses to rely on at trial *only if* the law and facts relevant to plausible options are thoroughly investigated. *Id.* at 521-22; s*ee also Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541, 554 (11th Cir. 2015) ("[T]he obligation to conduct a reasonable investigation does not require defense counsel to 'discern every possible avenue which may hurt or help the client,' but it does require counsel to 'make an effort to investigate the obvious.'") (quoting *House v. Balkcom,* 725 F.2d 608, 618 (11th Cir. 1984)). The district court correctly concluded that Mr. Kempaner did not make any effort to investigate the obvious defense of voluntary intoxication. (Doc. 19 at 16) (concluding "trial counsel did not investigate the voluntary intoxication defense beyond reading Dr. Rogers' report and briefly discussing Mr. Rieber's drug use with some of his family members.")

### B.    Mr. Kempaner's Failure To Pursue A Voluntary Intoxication Defense Was Not Reasonable.

The State argues that a voluntary intoxication defense was "wholly incompatible" with the defense of mistaken identity and, therefore, counsel's failure to pursue it does not automatically constitute a *Strickland* violation. (Resp. Br. at 16, 24.) The State cites *Dill v. Allen*, 488 F.3d 1344, 1357 (11th Cir. 2007), in support of the argument that Mr. Rieber's constitutional right to effective assistance of counsel did not require Mr. Kempaner "to channel Scheherazade in recounting myriad possible theories." (Resp. Br. at 24.) But as this Court recognized in *Dill*, "[r]easonableness, indeed, suggests that a trial counsel would weigh competing theories and choose to present the most compelling theory among the various options." (*Dill*, 488 F.3d at 1357.)

It is not Mr. Rieber's claim that Mr. Kempaner should have exhausted a myriad of unreasonable, unviable alternative theories, or presented multiple, conflicting defenses to the jury. But when presented with the conclusions in Dr. Roger's report, clearly suggesting a voluntary intoxication defense – a defense that could have foreclosed the death penalty – Mr. Kempaner had a constitutional duty to investigate that defense. He did not. Mr. Kempaner did not engage in

any analysis or weighing of competing theories. He wholly ignored the voluntary intoxication defense.

The State also excuses Mr. Kempaner's failure to pursue voluntary intoxication because Mr. Rieber never brought up any drug-induced blackout in their discussions or suggested a different defense. (Resp. Br. at 16.) But Mr. Kempaner knew this information because he read the Rogers report, which he had sought leave from the court to obtain. It was not Mr. Rieber's responsibility to suggest legal defenses to Mr. Kempaner, particularly ones based on Alabama case law calling for a lesser-included jury instruction. Mr. Kempaner was Mr. Rieber's attorney. He owed Mr. Rieber a duty of competence, and Mr. Kempaner had sufficient information to prompt him to pursue the voluntary intoxication defense. But he failed to satisfy his duty.

In addition to the Rogers report, Mr. Rieber's brother, Warren Rieber, told Mr. Kempaner that, in his opinion:

> "[Mr. Rieber] was a drug addict, that he would use any kind of drug he could get really. He would ask you what it was going to do to him and when you told him if it was a pill in your mouth it went in, if it was something you could snort he was reaching for a straw, if it was something you could smoke he would have his lighter in his hand."

(Doc. 16-82 at 125.) Mr. Kempaner ignored this information too, failing to investigate or develop any evidence related to Mr. Rieber's obvious habitual drug use, and reported intoxication on the night of the offense. Mr. Kempaner's failure to investigate was not reasonable in light of the information he had before him and the death sentence at stake.

### C. Mr. Kempaner's Failures Prejudiced Mr. Rieber.

The State argues that the testimony adduced at the Rule 32 hearing regarding Mr. Rieber's intoxication would not have entitled him to the lesser-included manslaughter instruction. (Doc. 19 at 21 (quoting Doc. 16-93 at 112); Resp. Br. at 26.) In particular, the State argues the district court properly afforded deference to the Alabama Court of Appeals' conclusion that Mr. Rieber did not establish that his intoxication *at the time of the crime* rose to the requisite level of insanity.[2] (Resp. Br. at 19-20.) This argument is misplaced for two reasons.

---

[2] While Alabama courts have described the level of intoxication necessary to negate the specific intent element as rising to the level of "insanity," this specifically refers to a level of intoxication that is "so excessive as to paralyze the mental facilities, and render the accused incapable of forming or entertaining the design to take life." *Ex parte Bankhead*, 585 So. 2d 112, 120–21 (Ala. 1991) (citation omitted).

First, Alabama law at the time of the underlying trial was replete with cases requiring that a trial court present a manslaughter charge to the jury in a capital murder case where there is evidence that the defendant had consumed drugs or alcohol before the crime. *See, e.g.*, *Fletcher v. State*, 621 So. 2d 1010 (Ala. Crim. App. 1993) (evidence the defendant smoked crack cocaine and was "high" on the evening of the crime); *Silvey v. State*, 485 So. 2d 790 (Ala. Crim. App. 1986) (defendant "had been drinking all day" before the crime but did not appear intoxicated or drunk to law enforcement after arrest); *Owen v. State*, 611 So. 2d 1126 (Ala. Crim. App. 1992) (defendant drank four to eight beers). Indeed, a voluntary intoxication charge is warranted "'*if the record contains evidence of the recent use of intoxicants of such nature or quantity to support the inference that their ingestion was sufficient to affect defendant's ability to form the necessary criminal intent.*'" *Fletcher*, 621 So. 2d at 1020-21 (quoting with approval *People v. Rodriguez*, 564 N.E.2d 658, 659 (N.Y. 1990) (emphasis in original)).

Second, the District Court did not need to defer to the Alabama Court of Criminal Appeals' holding as a binding legal interpretation of state law. The state court did not hold, nor could it have in light of the

precedent cited, that Alabama law did not support an intoxication defense. Rather, the state court mischaracterized and misinterpreted the substantial evidence that Mr. Rieber was intoxicated at the time of the offense. Alabama law "is clear that where there is evidence of intoxication, the extent to which the accused is intoxicated is a question to be decided by the jury." *Fletcher*, 621 So. 2d at 1021 (holding that the trial court's determination the appellant's intoxication did not rise to the requisite level "invaded the exclusive province of the jury") (citation omitted).

Here, there was substantial evidence presented at the 2011 evidentiary hearing – *over twenty years after the crime* – regarding Mr. Rieber's intoxication that warranted a lesser-included instruction:

- **Sonya Williamson** recalled being at a drug party at Jo Duffy's house on October 9, 1990, the date of the offense. (Doc. 16-83 at 74.) She testified that she saw Mr. Rieber snorting crystal meth, smoking pot, and drinking alcohol that evening at the party. (Doc. 16-83 at 73-75.) She was never contacted by trial counsel. (Doc. 16-83 at 75.)

- **Jo Duffy** testified that Mr. Rieber regularly attended drug parties at her house, used marijuana daily, and used harder drugs like crystal meth, cocaine and LSD, "as he could get it." (Doc. 16-83 at 64-65.) On the night of the offense, Mr. Rieber attended one of these drug parties at Ms. Duffy's house, arriving "around dark," approximately "between 6:30, 7 ish," at which time Ms. Duffy saw Mr. Rieber using drugs, recalling

that he "maybe smok[ed] pot, [drank] a beer or something." (Doc. 16-83 at 62-70.) Ms. Duffy was not contacted by trial counsel, though she fully expected to be called as a witness given the drug party that took place that night at her home. (Doc. 16-83 at 69-70.)

- **Derrell Dwayne Maroney** was with Mr. Rieber at Ms. Duffy's house on the day of the offense, where "everybody there was high" on acid, which Mr. Maroney concluded that Mr. Rieber "obviously" did. (Doc. 16-83 at 96, 98, 102.) Mr. Maroney was not contacted by trial counsel. (Doc. 16-83 at 97.)

- **Dennis Howell** saw Mr. Rieber in the evening on the date of the offense, and observed: "[h]e was sitting in a recliner and just constantly rocking back and forth…nonstop for 45 minutes [to] an hour." This was a behavior Mr. Howell had not seen Mr. Rieber do before. (Doc. 16-83 at 90-91.) Mr. Howell recalls being contacted by someone but the names of Mr. Kempaner, Mr. Moran and investigator Glen Brooks were not familiar to him. (Doc. 16-83 at 93-94.)

- **Charity Hubert**, Mr. Rieber's former girlfriend, testified that she was with Mr. Rieber at the drug party in the afternoon on the day of the offense. (Doc. 16-82 at 174-178.) Ms. Hubert confirmed that Mr. Rieber used drugs such as crystal meth and acid "[w]henever it was available." (Doc. 16-82 at 175.) "[She] never was contacted by any of the defense team at all to testify." (Doc. 16-83 at 70.)

- **John Walls** testified that he saw Mr. Rieber smoke marijuana "all the time" and use LSD on a "pretty constant" basis. (Doc. 16-82 at 148-149.) Mr. Walls also indicated that he saw Mr. Rieber snort cocaine more than once per week and take crystal meth at least once per month. (Doc. 16-82 at 149-150.) John Walls was never contacted by trial counsel. (Doc. 16-82 at 153.)

- **Beth Piraino** testified that she saw Mr. Rieber smoking marijuana and drinking alcohol over a period of years and that

Mr. Rieber's mother would smoke marijuana with them. (Doc. 16-82 at 165-170.) Beth Piraino was never contact by trial counsel. (Doc. 16-82 at 170.)

- **Tim Hubert** testified that he saw Mr. Rieber doing crystal meth and frequently saw him use marijuana and drink alcohol. (Doc. 16-83 at 53-54.) Tim Hubert was never contacted by trial counsel. (Doc. 16-83 at 54.)

- **Shauna Jenkins**, Mr. Rieber's sister, also testified that in the days leading up to October 9, 1990, she witnessed Mr. Rieber using marijuana and alcohol nearly every day. (Doc. 16-82 at 140-141.)

- **Warren Rieber,** Mr. Rieber's brother, testified that Mr. Rieber was using marijuana, cocaine, LSD, and meth in the years leading up to 1990 and that he used it "every day for awhile." (Doc. 16-82 at 116-117.)

- **Military Records** from the United States Navy also detailed Mr. Rieber's discharge for the use of cocaine and other related charges (Doc. 16-83 at 51-52 (admission of Exhibit) and Doc. 16-80 at 11-21 (Exhibit 6).)

Other than Mr. Rieber's siblings, none of the above-mentioned witnesses were ever contacted by Mr. Rieber's attorneys before trial or sentencing. Had Mr. Kempaner (or Mr. Moran) contacted these individuals prior to trial, their recollection of Mr. Rieber's drug use on the date of the offense would have been even more detailed than it was over twenty years after the fact. But even based on the evidence available decades later, a lesser-included instruction was warranted.

Multiple witnesses observed Mr. Rieber's use of various drugs and alcohol and described him as being "high" as close in time to the offense as possible. This evidence should have been investigated, developed, and presented at trial, and a lesser-included instruction should have been given as required under Alabama law. *See Fletcher*, 621 So. 2d at 1020-21. Mr. Kempaner's failure to take these basic and obvious steps was prejudicial. *See generally Fletcher*, 621 So. 2d at 1021 (where "the question of intent to kill is the sole and critical distinction between . . . two offenses, one of which carries a possible penalty of death and one which does not, there is an obvious and significant benefit to a defendant in having the jury instructed that it might consider his intoxication in deciding whether he had a specific intent to kill.")

## II. SENTENCING COUNSEL WAS INEFFECTIVE FOR FAILING TO DEVELOP AND PRESENT MITIGATING EVIDENCE OF MR. RIEBER'S INTOXICATION AT THE TIME OF THE CRIME.

The State argues that Mr. Rieber's sentencing counsel, Dan Moran, was not ineffective for presenting mitigating testimony focused on Mr. Rieber's good character instead of offering mitigating evidence corroborating Mr. Rieber's admitted drug use before the crime. (Resp. Br. at 2, 38-39.) Further, the State argues that Mr. Rieber was not

prejudiced because the evidence presented at the Rule 32 hearing would not have made a difference to the trial court. (*Id.* at 39.) The State is wrong on both points.

### A. The Presentation Of Mitigating Evidence Related To Mr. Rieber's Good Character Does Not Excuse The Failure To Develop Mitigating Evidence Of Mr. Rieber's Drug Use.

Mr. Moran's choice to focus on Mr. Rieber's good character as the primary mitigating factor was flawed. The jury had just determined that Mr. Rieber committed murder. Testimony from Mr. Rieber's mother that he was a "good boy," was unlikely to overcome the State's presentation, and it did nothing to rebut the State's vigorous attack on the Rogers report. The fact that Mr. Moran presented testimony from mitigation witnesses focused on Mr. Rieber's character does not undermine Mr. Rieber's ineffective assistance claim because Mr. Moran completely failed to investigate and present evidence of much stronger mitigating factors.

Mr. Rieber's drug use was no secret. The State tries to get around this mitigation evidence by describing Mr. Rieber as a "Navy veteran, no less." But the State ignores the more significant fact that Mr. Rieber was discharged from the military due to substance abuse – a fact known

and included in Dr. Rogers' report. (Doc. 16-86 at 133.) And during the penalty phase, Mr. Moran affirmatively relied on the Rogers report as the sole evidence regarding not only Mr. Rieber's drug use just before the crime, but also Mr. Rieber's troublesome family background and extended history of increasingly severe drug use.

Mr. Rieber reported to Dr. Rogers that he completely blacked out from drug use—having consumed many different drugs and alcohol in the period just before the crime—and had no recollection of the events of October 9, 1990. (Doc. 16-83 at 13; Doc. 16-86 at 130-132.) He reported drinking numerous alcoholic beverages, smoking marijuana, and using multiple hits of "acid" prior to the crime. (Doc. 16-86 at 135.) Furthermore, he told Dr. Rogers that he began using drugs at age nine. (Doc. 16-86 at 129.) Despite Dr. Rogers' awareness of Mr. Rieber's incentive to fabricate a blackout story, she nevertheless concluded in her report that, in her medical judgment, Mr. Rieber's reported lack of memory was more likely related to substance abuse than misrepresentation. (Doc. 16-83 at 13; Doc. 16-86 at 132-135.) As the State sets forth in its brief, the prosecution attacked the Rogers report vigorously before the sentencing jury, arguing that by the time of trial,

several months after the robbery, Mr. Rieber had time to "invent" his drug use before the crime in an attempt to create mitigating evidence for trial. (Resp. Br. at 31.) Still, the jury recommended 7-5 that Mr. Rieber be sentenced to life without parole. (Doc. 16-85 at 162.)

Following the penalty phase of the trial, Mr. Moran was on clear notice that the State would attack the Rogers report at sentencing in the same manner it had before the jury. Mr. Moran had nearly two months to buttress the Rogers report with corroborating evidence, such as that which was available nearly twenty years later, as discussed above. *See supra* at Section I.C. Instead, Mr. Moran did ***nothing at all*** to bolster Mr. Rieber's case against imposition of the death penalty between the penalty phase before the jury and the sentencing hearing before Judge Blankenship. (Doc. 16-33 at 6, 8, 10.) Mr. Moran's time sheets show that while he meticulously noted his time for his representation, to the tenth of an hour, he recorded no time at all during this critical period. (*Id.*)

During the key sentencing hearing before the court, Mr. Moran again presented the Rogers report without any corroborating mitigating evidence or testimony. Considering the applicable, statutory mitigating

factors, the trial court expressly rejected the Rogers report because of a lack of corroborating evidence of Mr. Rieber's intoxication. As to Alabama Code § 13A-5-51(2), that the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance, the court concluded:

> "However, **there is no evidence** before the Court that the defendant was under the influence of drugs and alcohol at the time of the offense and, **accordingly, the Court does not accept the view of the forensic examiner** that this memory lapse, if it did in fact occur, occurred due to substance abuse."

(Doc. 16-62 at 98 (emphasis added).) As to Alabama Code § 13A-5-51(6), the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, the court concluded:

> "The **only evidence offered to support such a finding is a conclusion that can be reached in the forensic report** to the effect that the defendant was under the influence of drugs and alcohol at the time of the incident. This Court has determined that **the evidence presented on this subject is not sufficient** for this Court to find that this mitigating circumstance exists."

(Doc. 16-62 at 98 (emphasis added).) The trial court rejected both mitigating factors, overruled the jury's recommendation, and sentenced Mr. Rieber to death by electrocution. (Doc. 16-79 at 94.)

But contrary to the trial court's conclusions, as the Rule 32 hearing demonstrated, there *was substantial* evidence available that went directly to the mitigating factors rejected by the court for a lack of evidence. Having opted to rely on Mr. Rieber's drug use as reported to Dr. Rogers as a mitigating factor, Mr. Moran was constitutionally obligated to investigate, develop, and present this evidence in support of the Rogers report – all of which was available to him. He completely failed to do so. It is true that at the hearing on Mr. Rieber's re-sentencing motion, Mr. Moran told the court that there was nothing in the record to corroborate the Rogers report. (R. 16-79 at 109-111.) But it only was true because Mr. Moran had not done anything to develop the record on this point.

### B. Mr. Moran's Failure To Develop Mitigating Evidence Related To Mr. Rieber's Drug Use Was Prejudicial.

Mr. Rieber was prejudiced by Mr. Moran's ineffective assistance. The State emphasizes the lower court's conclusions that Mr. Rieber was not prejudiced because the postconviction evidence did not show intoxication at the time of the crime. (Resp. Br. at 39.) But the sentencing court explicitly rejected the above-mentioned mitigating factors due to a lack of *any* evidence corroborating the Rogers report.

And as the district court acknowledged, the evidence Mr. Moran failed to investigate, develop, and present *did* corroborate Dr. Rogers' report:

> "The evidence presented at the Rule 32 hearing corroborates the part of Dr. Rogers' report reciting Mr. Rieber's history of drug use. [...] ***The evidence also corroborates Mr. Rieber's claim that he consumed hard drugs and alcohol on the day of the murder.***"

(Doc. 19 at 28 (emphasis added).) As to the district court's conclusion that the postconviction evidence did not support the claim that Mr. Rieber was intoxicated at the time of the crime, the court's reasoning is flawed.

At the Rule 32 hearing, Jo Duffy testified that on the night of the offense she saw Mr. Rieber using drugs at her house "***around dark***," approximately "between 6:30, 7 ish," recalling that he "maybe smok[ed] pot, [drank] a beer or something." (Doc. 16-83 at 67.) Other witnesses testified that they saw Mr. Rieber consuming hard drugs at the same party (Doc. 16-83 at 73-75, 96), including Sonja Williamson who recalled Mr. Rieber smoking pot and drinking alcohol "***that evening.***" (Doc. 16-83 at 74-75.) Absent an eye witness testifying that they saw Mr. Rieber consuming drugs *simultaneous* to the offense, the evidence presented clearly demonstrated that Mr. Rieber consumed multiple drugs and

alcohol in close proximity to the offense, and likely *within an hour of the offense*, which occurred around 8:00 p.m. (Doc. 16-74 at 45.)

Further, Dr. Alex Stalcup, an unchallenged expert in the field of drug use and its effects, testified at the Rule 32 hearing that a person consuming the drugs Mr. Rieber consumed just before the convenience store crime very possibly could have a blackout or short circuit, and this would not be an unusual result from such drug consumption. (Doc. 16-83 at 148-151.)

Had Mr. Moran presented all of this relevant and competent mitigating evidence, the court would have been presented with compelling, corroborating evidence supporting at least two of the statutory mitigating factors in effect at the time of Mr. Rieber's sentencing. The sentencing court's record, as well as the record on Mr. Rieber's re-sentencing motion, make clear that Mr. Moran's failure to investigate and present mitigating evidence of Mr. Rieber's drug use – evidence that corroborated the Rogers report – made a difference in the outcome of Mr. Rieber's sentence. The court explicitly noted the absence of such evidence in reaching its conclusion that the mitigating circumstances *and* the jury's recommendation of life without parole

were outweighed by aggravating circumstances. But for Mr. Moran's failure to develop and present mitigating evidence of Mr. Rieber's drug use, there is a reasonable probability the mitigating evidence would have outweighed the aggravating factors and, as a result, the death penalty would not have been imposed.

## III. LAW AND JUSTICE SUPPORT GRANTING MR. RIEBER'S HABEAS PETITION.

Equitable and prudential considerations overwhelmingly weigh in favor of granting Mr. Rieber's habeas petition. The State cites its interest in enforcing "societal norms through criminal law" in support of its argument that law and justice support denying Mr. Rieber's habeas petition. But this interest is not served by executing Mr. Rieber.

First, the death penalty scheme under which Mr. Rieber was sentenced is unconstitutional under *Hurst v. Florida*, 577 U.S. 92 (2016). In *Hurst*, the Florida court overrode the jury's vote (tantamount to a recommendation of life imprisonment) to impose the death penalty. The United States Supreme Court held that Florida's death penalty scheme – which Alabama courts have described as near-identical to Alabama's – violated Hurst's constitutional right to a trial by jury because the court, not the jury, made findings on which the sentence

was based. *See Ex parte Harrell*, 470 So. 2d 1309, 1317 (Ala. 1985) ("Alabama's procedure permitting judicial override is almost identical to the scheme used in Florida.")

Further, the "clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures" as well as state practice. *Atkins v. Virginia*, 536 U.S. 304, 312 (2002) (citation omitted). Recognizing that Alabama's capital sentencing scheme is virtually identical to the defective, former Florida scheme, the Alabama legislature passed Senate Bill 16 (Ala. Act 2017-131), signed into law on April 11, 2017, ending judicial override and vesting juries with the sole authority to impose the death penalty in capital cases. The new law amends Alabama Code § 13A-5-46, the statute under which Mr. Rieber was sentenced, to require at least ten of twelve jurors to vote in favor of the death penalty before such a sentence may be imposed.

Although close to thirty states currently have active death penalty statutes, none of these states permits a judge to impose the death penalty after a jury votes for life imprisonment. Alabama, in fact, was the final state to abolish judicial override. This constitutes not merely

"national consensus," *see Kennedy v. Louisiana*, 554 U.S. 407, 426 (2008), but unanimous agreement that a sentence of death imposed by a judge contrary to a jury's life verdict does not comport with societal norms.

Finally, in 2020, the United States Supreme Court decided *McKinney v. Arizona*, 589 U.S. 139, 145 (2020), which held in relevant part (but with no explanation), that *Hurst* does not apply retroactively on collateral review. Under *McKinney*, because Mr. Rieber's case became final on direct review in 1995, Mr. Rieber – solely as a result of bad timing – remains subject to an unconstitutional death sentence.[3] Had Mr. Rieber's case taken longer to progress through the Alabama courts on direct review, his death sentence could not stand under *Hurst*. In other words, if every single factor in this case were identical, except *when* the jury voted for life, Mr. Rieber could not have been sentenced to death. Law and justice recognize the judicial override scheme to which Mr. Rieber was subject is unconstitutional, and he should not remain subject to an unconstitutional death sentence as a result of the arbitrary timing of his appeal.

---

[3] Mr. Rieber recognizes this Court is bound by *McKinney*, but maintains that *McKinney* was wrongly decided for purposes of preserving his claims on appeal.

## CONCLUSION

For these reasons, Petitioner-Appellant Jeffery Day Rieber respectfully requests that this Court reverse the district court's dismissal of Mr. Rieber's habeas petition.

Respectfully submitted,

By: *s/ James A. Friedman*

James A. Friedman
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI 53703
Phone: (608) 257-3911
Email: jfriedman@gklaw.com

Emma J. Jewell
GODFREY & KAHN, S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
Phone: (414) 287-9616
Email: ejewell@gklaw.com

July 1, 2024          *Attorneys for Jeffery Day Rieber*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of 11th Cir. R. 22-2 and Fed. R. App. P. 32(a)(7)(B) because, excluding parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,639 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionally spaced typeface using Microsoft Word 365 in 14-point Century.

*s/ James A. Friedman*
James A. Friedman

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 1, 2024, I electronically filed the foregoing **Reply Brief of Petitioner-Appellant** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Lauren A. Simpson.  I further certify that I also caused a copy of the foregoing document to be sent by U.S. Mail to the following address:

Lauren A. Simpson
Assistant Attorney General
Office of the Attorney General
Capital Litigation Division
501 Washington Ave.
Montgomery, AL 36130
Lauren.Simpson@alabamaag.gov

*s/ James A. Friedman*
James A. Friedman

31354375

24